Minnie E. H. Thornton, Admx.,

*vs.*

Maine State Agricultural Society.

Franklin.    Opinion December 11, 1902.

*Agricultural Society.    Fairs.    Negligence—Fire-Arms.    Public Safety.
Shooting Gallery.    Death by Wrongful Act.    Stat. 1891, c. 124.*

1.  It is the duty of an agricultural society giving an exhibition or "fair" to which the public are invited, and for admission to which a fee is charged, to use reasonable care to keep its grounds and the usual approaches to them, so far as the approaches are under its control, safe for all who attend the "fair" by its invitation.

2.  So it is its duty to use reasonable care to see that there is no firing of dangerous fire-arms upon its grounds, at such a place and under such conditions as to jeopardize the life or limb of any of those whom it has invited to its fair, whether they are for the time being within the grounds, or properly within the usual approaches thereto, outside of the grounds.

3.  The "fair" to which the public were invited in this case must be regarded as consisting not only of the exhibits and performances more particularly under the defendant's own direction, but also, of all the shows, exhibits and attractions of all kinds, recognized by the defendant and permitted to have space upon its grounds.

4.  It was the duty of this defendant to use reasonable care, in making allotments of space for exhibits, shows and other features, and in their subsequent inspection and supervision, to see that the safety of the invited public was not endangered.

5.  It is immaterial whether the occupant of space so allotted was technically a lessee, or a licensee.    As between the defendant and the invited public, the duty still remained upon the former of using reasonable care to see that all of the exhibition grounds were safe; and this duty would be particularly urgent in case of an exhibition or sport which might, unless properly conducted, be attended with danger, such as would be the use of fire-arms.

6.  In this case the defendant society was giving a "fair." It had let space upon its grounds for a shooting gallery.    It is satisfactorily shown that a bullet fired by a patron of the shooting gallery, while at target practice, missed the target, passed through the fence enclosing the exhibition grounds, and struck and killed the plaintiff's intestate, who was then standing upon the railroad platform outside of the grounds.

7. While this platform was neither owned nor controlled by the defendant, it was one of the usual approaches to its grounds; and it is the opinion of the court, that there was sufficient evidence to justify the jury in finding that the deceased, at the time when and place where he was killed, was within the scope of the defendant's invitation to the public to attend the fair and therefore that the defendant owed him the duty of using reasonable care for his safety as before stated.

On motion by defendant. Overruled.

Action under Stat. 1891, c. 124, by the plaintiff, who is the widow of George W. Thornton, to recover damages suffered by the death of her husband which she alleged was caused by the wrongful act and neglect of the defendant.

The jury gave a verdict of $2500 for the plaintiff and the defendant filed the usual motion for a new trial.

The case appears in the opinion.

*E. E. Richards; W. H. Newell and W. B. Skelton,* for plaintiff. *G. C. Wing,* for defendant.

SITTING: EMERY, STROUT, SAVAGE, POWERS, PEABODY, SPEAR, JJ.

SAVAGE, J. This is an action brought by an administratrix, for the benefit of the widow, under Stat. 1891, c. 124, which provides for the recovery of damages for the death of a person when caused by the wrongful act, neglect or default of another. The plaintiff recovered a verdict, which the defendant now seeks to have set aside, upon the usual grounds.

The following facts appear to be either undisputed, or proved by so much weight of evidence that a jury would unquestionably be warranted in believing them to be true. The defendant society was holding its annual "fair" at Lewiston, during the first week in September, 1901. There were many exhibits of stock, agricultural products, and other articles. There was a track and racing upon it. There were sports and shows of many kinds and descriptions. There was a "Midway" and a "Fakirs' Field." And all were upon the exhibition grounds of the defendant, and within a high enclosing fence. To gain admission to the grounds, a fee had to be paid, and these admis-

sion fees furnished a portion of the defendant's income. It also derived an income from the letting of space upon the grounds to the various exhibitors and showmen. Alongside the grounds of the defendant, on one side were the tracks of the Maine Central Railroad. Between the railroad tracks and the fence before referred to, was a wide platform for the accommodation of passengers who should arrive or depart by the railroad trains. This platform appears to have been upon railroad land, and outside of the defendant's grounds, and it would seem that it was not built by the defendant nor under its control. Gates opened from the platform to the exhibition grounds.

On Tuesday, September 2, 1901, the defendant let to one Harvey Slauenwhite, or White, a space of ground, part of lot No. 4, twelve and one-half feet by thirty, for use as a shooting gallery during the fair. It was situated on the "Fakirs' Field," and faced on one of the streets that went down through the "Midway." The defendant gave White a receipt in the following language:—

"MAINE STATE FAIR. No. 4, lower. Renters' Receipt.
Received of H. White six and 25-100 dollars for privilege of shooting gallery and dolls. Total rent $12.50; due $6.25.
C. B. Bailey for the society."

It should be said that along the fence by the railroad platform, the defendant, in letting space, reserved a passage-way six feet wide. The space thus let to White butted upon this passage-way, so that the end of White's lot towards the railroad platform was six feet distant from the fence and platform. The fence at that point was about eleven and one-half feet high, and the platform was about four feet from the ground. The fence boards were a little less than one inch thick.

After White contracted for this space, he set up, and thereafter operated, a shooting gallery on the lot. The shooting bench was placed thirty-three feet from the fence; and twenty-five feet from the shooting bench, towards the fence, two targets were so placed that in shooting from the bench towards the targets, the gun would be aimed in the direction of the fence and railroad platform. One target was circular, and about twelve to fifteen inches in diameter.

The size of the other, which was the figure of a woman, is not given. The top of the targets was five feet and three inches from the ground. Back of the targets, that is, between them and the fence and platform, was an oak "shield," five feet long horizontally, and three feet and six inches wide, and so fastened that its top was six feet and two inches from the ground. The thickness of the shield is not given, nor is it material in this case.

On Thursday, September 4, at about one o'clock in the afternoon, the plaintiff's intestate was standing on the railroad platform, outside of defendant's grounds, about ten feet from the fence. He was not in the rear of White's shooting gallery, nor in the direct range from the shooting bench to the targets. He stood a few feet, probably from five to ten feet, southerly of such a range. The report of the discharge of a gun or rifle on the inside was heard, and he fell, shot through the aorta. Death was immediate. A freshly made hole, eight feet from the ground, was found in the fence in a direct line between the point where the deceased fell and the shooting bench of White's gallery. An examination of the evidence leaves no doubt in the minds of the court that the bullet which caused his death came from that gallery, and that in its course it passed diagonally from the bench to the fence, several inches higher than the shield and several feet to the left of it. Just before the shooting, two or three women were seen shooting there, one of whom, at least, attracted attention by her inexperience in firing, or carelessness, or both. After the shooting, a thorough examination of the shooting gallery was made, and there were found there two Winchester Magazine rifles, and no other guns or rifles. There were also found a number of boxes of the Union Metallic Cartridge Company's 22 caliber short cartridges, and no other ammunition. Tests afterwards made with these rifles and cartridges showed that a bullet discharged from one rifle at a distance of thirty-three feet penetrated through three pine boards, each seven-eighths of an inch thick, one pine board three-quarters of an inch thick, one spruce board an inch thick, and struck the wall beyond, while a bullet from the other rifle penetrated through the first four of the above mentioned boards and was embedded in the fifth. It must be regarded, therefore, that at the time in question, White was using

in his shooting gallery deadly weapons, loaded with cartridges easily capable of producing a fatal result, and that he was then using no others; and that in consequence of such use, plaintiff's intestate was killed. That such a proceeding was extremely dangerous to life and limb, and highly culpable on the part of White, is self-evident.

The defendant, however, disclaims any responsibility for the conduct or misconduct of White. It does so on two grounds. First, that the relation between itself and White was that of landlord and tenant; and secondly, that it exercised reasonable care, all that the law in any event required, in keeping its grounds, including the space occupied by White, safe. Under the first ground, it invokes the familiar rule that a landlord is not responsible for negligent or tortious acts committed without his consent, upon the leased premises, by a tenant.

The defendant says that shooting galleries are among the usual concomitants of fairs everywhere, and that as such they are entirely proper; that, as usually conducted, they are not dangerous; that the bullets ordinarily used, known as "B. B.'s" and "C. B.'s" are manufactured especially for shooting gallery purposes, of light weight, and in cartridges containing only a small quantity of powder or other explosive substance; that for such bullets, the protection afforded by the shield at White's gallery was ample; that by its contract with White, it only consented impliedly that the gallery should be operated in the usual manner and with the usual ammunition; and that it did not know of, or have the means of knowledge, and did not consent to the manner in which the gallery was being used on the day in question. It claims that it was under no duty to the plaintiff "to warn him of hidden dangers, which defendant had no means of knowing, and that it was not obliged to see if there were any such dangers." In short, it claims that "the accident resulted solely from the wilful, unauthorized and unexpected use of dangerous and improperly constructed cartridges on the part of its lessee, without knowledge of the defendant and beyond its duty to prevent." In determining the soundness of the defendant's position generally, in regard to its duty to those whom it invited to attend its fairs, we do not think it is necessary to decide whether White was a tenant or a

licensee for a specific purpose. The defendant's duties to the invited public were the same in either case.

The defendant was giving a great exhibition, to which the public, far and near, were invited. The "fair" to which the public were invited consisted not only of the racing of horses and of the exhibition of live stock and agricultural and manufactured products and machinery or implements, which it may be supposed were more directly the objects of the society in holding the fair, but also of all the shows, exhibits, and attractions of all kinds, recognized by the defendant and permitted by it to have space upon its grounds. The fair was undoubtedly intended to be, in the matter of attractiveness, all things to all men. Some visitors would be attracted by one feature, others by another. All of these attractions tended to draw visitors to the fair, and to increase the income of the defendant, which took gate-money from all. These attractions, no less than the defendant's own exhibits, constituted a part of the fair to which the public were invited.

It is too well settled to need the citation of authorities, that if the owner or occupier of land either directly or by implication induces persons to come upon his premises, he thereby assumes an obligation to see that such premises are in a reasonably safe condition, so that the persons there by his invitation may not be injured by them or in their use for the purpose for which the invitation was extended.

Therefore, having invited the public to its fair, it was the duty of the defendant to use reasonable care to keep its grounds and the usual approaches to them, so far as the approaches were under its control, in a safe condition, safe for all who were invited. It was its duty to use reasonable care that there should be no traps or pitfalls into which the invited might fall, and that there should be no danger-ous plays, or sports, or exhibitions, by which the invited might be injured. In short, to reach this case, it was its duty to use reason-able care that there should be no firing of dangerous fire-arms upon its grounds, so as to jeopardize the life or limb of any of those whom it had invited to its fair, whether they were at the time within the grounds, or properly within the usual approaches to the grounds, as, for instance, upon the railroad platform.

VOL. XCVII 8

The defendant would not be relieved from this duty by leasing portions of its grounds to the proprietors of shows and attractions, and becoming their landlord. As between it and the invited public, the duty still remained of using reasonable care to see that all of the exhibition grounds were safe. It was its duty so to do both in the original letting of space, and in the subsequent inspection and supervision of the show thus permitted to give its exhibition, or of the shooting gallery thus permitted to operate as a part of the fair. And this duty would be particularly strong and urgent in case of an exhibition or sport which might, unless properly conducted, be attended with danger, such as the use of fire-arms.

These views are well supported by authority. The court in *Sebeck* v. *Plattdeutsche Volksfest Verein,* 64 N. J. L. 624, 81 Am. St. Rep. 512, 50 L. R. A. 199, speaking of the duties of the proprietor of a park to which the public had been invited and for entering which an admission fee was charged, said: "Having invited the public to its park, it was chargeable with the duty of using reasonable care to see that the premises were kept in a safe condition for the use of its guests; and if the exhibition, although given by an independent contractor, was of a character to jeopardize the safety of those who were present on the defendant's invitation, the duty was cast on the latter of taking due precautions to guard against injury." *Hart* v. *Washington Park Club,* 157 Ill. 9, 48 Am. St. Rep. 298, 29 L. R. A. 492; *Dunn* v. *Brown County Agricultural Soc.,* 46 Ohio St. 93, 15 Am. St. Rep. 556, 1 L. R. A. 754; *Lane* v. *Minn. State Agricultural Society,* 62 Minn. 175, 29 L. R. A. 708; *Schofield* v. *Wood,* 170 Mass. 415; *Mastad* v. *Swedish Brethren,* 83 Minn. 40; *Herrick* v. *Wixom,* 121 Mich. 384; *Windeler* v. *Fair Association,* (Ind.) 59 N. E. Rep. 209; *Fox* v. *Buffalo Park,* 21 N. Y. App. Div. 321, affirmed in 163 N. Y. 559. In *Richmond & Manchester Ry. Co.* v. *Moore,* 94 Va. 493, 37 L. R. A. 258, the court held "that the fact that a balloon ascension in a park owned by a street car company to which the public were invited and given by an independent contractor did not relieve the owner of the park from liability for failure to use due care that persons visiting it should not be injured by the dangerous character of the apparatus connected with the inflation

of the balloon." In *Thompson* v. *Lowell, etc., Street R. Co.*, 170 Mass. 577, 64 Am. St. Rep. 323, 40 L. R. A. 345, it was held "that the fact that an exhibition," given at grounds provided by the defendant, a street car company, for the free entertainment of its patrons, "was provided and conducted by an independent contractor would not wholly relieve the defendant from responsibility, provided it was of such a kind that it would probably cause injury to a spectator, unless due precautions were taken to guard against harm." *Conradt* v. *Clauve*, 93 Ind. 476, 47 Am. Rep. 388, was a case very much like the one at bar. The defendants, who were the proprietors and managers of a public fair, had allotted part of the grounds for practice in shooting with a target gun. The plaintiff was a patron of the fair, and his horse, hitched near the ground allotted for target shooting, was killed by a ball fired from the target gun. The court in affirming judgment for the plaintiff said:—"The practice in target shooting appears to have been a part of the entertainment carried on at the fair, and as the defendants were the owners of the premises, and the managers and controllers of the fair, the practice in target shooting was a part of their exhibition, and under their supervision and control as much as any other part of the fair. And those having charge of the practice, as well as those engaged in it, while perhaps not strictly agents or servants of the defendants, were acting under the license and permission of the defendants; and such a relation existed between them as will hold the defendants liable for injuries resulting from their negligence in not properly controlling the conduct and management of this part of their exhibition."

Some of the cases cited are those where the injuries resulted from the negligence of independent contractors, and not lessees. But we can perceive no tenable distinction in a case like this. In either case, the offending thing is where it is by the license and permission of the owners of the premises, and upon ground which the owners, by virtue of their invitation to the public, hold out as safe. This is the ground of their liability. By inviting patrons to their fair, they make themselves bound to use reasonable care to see that the fair in all its parts is safe and is conducted safely, whether the various parts of the fair are conducted and managed by the owners them-

selves, or with their permission, by licensees, independent contractors or lessees. Such is the conclusion which rests upon good sense, and which seems to be clearly established by all the authorities upon the subject.

The only questions remaining for consideration then are whether the plaintiff's intestate at the time he was killed was within the protection of the defendant's invitation, and whether the defendant had exercised that reasonable care which was required of it, with respect to the allotment of space to White for a shooting gallery, and the subsequent inspection and control of it. In regard to the first question, not strongly urged, though not conceded by the defendant, we perceive no real difficulty. It is necessary to state only one phase of the case. The deceased had attended the fair the two previous days. On the morning of the day in question, he left his wife in Auburn, at the house where they were staying, with the expressed purpose of going to the fair, and with an arrangement to meet his wife later in the day at the gate of the fair. From some cause they seem to have missed each other, and he did not meet her when she arrived, nor did she see him again alive. As already stated, he was standing on the railroad platform, where passengers from Auburn by railway train were naturally expected to alight, and from which platform there were gates into the fair grounds. The jury certainly might reasonably infer that he was where he was in connection with his agreement to meet his wife at the gate on her arrival from Auburn. And to be there at such a time and for such a purpose, would be within the scope of the defendant's invitation. And although he was outside of the defendant's grounds, under such circumstances, it would be the duty of the defendant to use reasonable care to prevent his being shot from a shooting gallery on the inside.

But the defendant urges that it did use reasonable care. The testimony relied upon by the defendant comes from two witnesses, the superintendent of the grounds and the chief of the State Fair police. The latter seems to have been, so far as it is important in this case, the servant or agent of the defendant. The defendant claims the benefit of his acts. Fairly epitomized, their testimony on this point is as follows:—The superintendent, who let the space to

White, being asked if any restrictions or regulations were made with White as to the manner of conducting the business, said, "I asked him, I says, 'of course your gallery is safe, is it not?' He says, 'yes, I run at Canton' and I was thinking he said Livermore— named one or two places; and he said, 'you can find out all about me up there at Livermore, or Livermore Falls.'" He further testified that he did not make any restrictions or regulations. He said he examined the shield "on the second day of the fair. It might have been the first;" that he then looked to see if everything was all right.

"Int. Did you look to see what kind of ammunition White was using?

Ans. No sir, I did not.

Int. Did you look to see what kind of a rifle he was using?

Ans. I saw he was using a regular shooting gallery rifle, I couldn't tell you exactly the make or anything of that kind.

Int. Could you tell by your examination of the rifle what kind of cartridges he was using?

Ans. Well, I could tell he was using a shooting gallery cartridge."

The witness said he knew a shooting gallery cartridge when he saw one, that it was a very small cartridge, with a very little lead projection, and that he knows that was the kind that White was using that first day he went down there, because they were displayed right there. He further said that he did not look to see if White was using any other kind.

The chief of the State Fair police testified that his duties took him all over the grounds, that he was probably by the White gallery many times a day, but he testified as to only two instances. He said that he visited the gallery the day before the shooting, and two days before, that on one of these visits,—he was unable to tell which,—he examined the cartridges, and that White was then using "B. B.'s" "little small cartridges," strictly shooting gallery cartridges. He said he saw the rifles discharged while he was there examining the cartridges. A box of B. B. cartridges was produced at the trial, and the witness, on cross-examination, said he thought they were of the

same size as White was using the day he visited him, but that he was not positive about that. He said, however, that he was positive that they were not the same kind of cartridges as found at the gallery after the shooting. He further said that he made no particular investigation to see what they were using, that he had no instructions to investigate, or to impose restrictions upon the gallery.

"Q. You had no instructions to take any charge or supervision over the shooting galleries, except simply to preserve order on the fair grounds.

Ans. That is right."

He said that the "B. B.'s" are as big as the "22 caliber shot," but not as long; that he saw no 22s there the day he visited the place; that the box of cartridges he saw sat right on top of the bench, but that he did not know what was in the drawers. He is sure White was using the same rifles that day as he was the day the deceased was killed.

This is all the material testimony which the case discloses upon the question of defendant's exercise of care. And the question now is whether the jury, taking the testimony as it stood, and giving to each part of it such weight as they lawfully might, were justified in their conclusion that the defendant failed to exercise ordinary care in the premises. What is ordinary care is peculiarly a question addressed to the sound judgment of juries, upon the evidence. Their conclusions should stand, unless shown to be clearly wrong. After a careful consideration of the facts in this case, concerning all of which there is little or no dispute, we are not convinced that the verdict should be disturbed. It is obvious that the ordinary operation of the shooting gallery required careful attention and some safeguards. Balls of lead, not very large perhaps, were fired at the targets. The fact that an oak "shield" was placed behind the targets is significant. The defendant seems to have made no investigation or examination of White's gallery at the time of the letting. It asked White if it was safe, and he said it was. But there was no investigation. That, however, is not important, if it made sufficient examination or supervision afterwards.

Again, the gallery was located so that the firing was towards the

railroad platform, thirty-three feet distant, along which thousands of the defendant's patrons might be expected to pass each day. It should have been anticipated by the defendant, we think, that inexperienced, unskilful, and even careless persons might patronize the gallery, who would fail to hit the target, and might fire wide of the mark, and it was its duty to take that consideration into account. Was a shield, five feet by three and a half feet, the top of which was only a little more than six feet from the ground, a sufficient protection against such shooting as should have been anticipated? We think a jury might reasonably conclude it was not. And a jury also might reasonably have concluded that the defendant was careless in placing a shooting gallery in such a place as this one was in. It must be remembered, however, that the plaintiff's intestate was outside of the fence, and the case must be decided with reference to the duty which the defendant owed to him there. It is claimed, and we think with much reason, that whatever the hazard might be to persons within the grounds, from the operation of the shooting gallery, the fence, which was higher than men's heads, was a sufficient protection to persons on the platform against any firing with the ordinary shooting gallery cartridges, and it is argued accordingly that the failure of the defendant to afford the deceased, standing where he was, further protection against such firing, should not be regarded as a want of ordinary care. It is not want of ordinary care in such case to fail to provide for the happening of contingencies which there is no reason whatever to expect.

So we come to the remaining ground. Could the defendant properly be held responsible with respect to the 22 caliber bullet which was actually fired? At the very outside, only twice in three days was anything like an inspection of the gallery made, once by the superintendent who "looked to see if everything was all right," and once by the chief of the police. Neither is able to fix the time positively, and for anything which appears in the case, both inspections may have been had the first day of the fair, or two days before the fatal shooting. The inspection of the superintendent seems to have been limited to noticing that shooting gallery rifles, as he called them, were then being used, from which he inferred that shooting gallery

cartridges were also being used. He says he did not look to see what kind of ammunition White was using. Neither seems to have made any particular investigation. The officer says he did not, though he testified that they were using shooting gallery cartridges, and that no others were in sight. As to these things, however, it may be that the jury relied less upon the memory of this witness than they otherwise would have done, for it appeared that he testified before the coroner's inquest, and there said, in answer to the question whether he examined the ammunition they were using, that he "didn't until after the accident."

It is undisputed that the rifles, from one of which the bullet was fired, were being used when the officer inspected the gallery. It was testified to and not disputed, that while a B. B. bullet may be fired from a Winchester Magazine rifle, such as these were, by pushing them in as in a single shot breach loader, yet that such bullets are not suitable for such a rifle, not suitable for use in a magazine. If the jury believed this, we think they might reasonably have thought that the very fact that it was known to the defendant or its officers and agents that such rifles were being used should have arrested the attention of the inspecting officers, and led to a more careful investigation of the ammunition being used, and that the investigations should have been more frequent. The jury might reasonably have thought that by the exercise of such care the fatal hazard might have been prevented. We do not forget that the superintendent says they were using the regular shooting gallery rifles. In view of the testimony that the rifles actually used were not suitable for shooting gallery cartridges, it was open to the jury to say which was correct. They may have believed that the superintendent was mistaken.

Upon the whole, we think the verdict is sustainable within the rules of law which imposed upon the defendant the duty of using reasonable care to furnish the plaintiff's intestate safe exhibition grounds to visit, and safe approaches thereto.

The defendant claims that the verdict of twenty-five hundred dollars is excessive. While it may be large, we do not think it was so unwarrantably large as to justify our interference. The deceased, at the time of his death, was thirty-three years old, and his widow was

twenty-three. Nothing appears but that he was industrious and temperate. He was a farmer, and in addition to carrying on his farm, at the time of his death he was earning, it is said, thirty-five dollars a month on the average, "collecting cream." It is not unreasonable to conclude that the loss of such a husband at such an age may be a great pecuniary injury to the widow.

*Motion overruled.*