ALBERT A. CLOUTIER *vs.* OAKLAND PARK AMUSEMENT COMPANY.

Androscoggin.      Opinion December 15, 1930.

*Clifford & Clifford,*
*W. H. Hines,* for plaintiff.
*Locke, Perkins & Williamson,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRING-
TON, JJ.   PHILBROOK, A. R. J.

BARNES, J.   A patron of defendant Amusement Company, who
had paid the admission fee required of frequenters of its dance hall,
on the night of August 31, 1929, while within the hall, and while
the program provided for the amusement of those present was being
carried on, was burned on head and hands by flaming material that
dropped upon him.

He sued for damages, alleging negligence on the part of defend-
ant and its servants in the construction and decoration of the dance
hall. The case comes to this court on report.

The dance hall was a rectangular building with inside measure-
ments about 105 feet by 50 feet.

Eight posts on a side, with two more at each end, of timber 6

inches by 6 inches and 12 feet 11 inches high, supported the ceiling beams, and separated the dancing floor from a promenade nearly 9 feet wide that surrounded the hall on three sides, except for a low orchestra platform on the promenade and projecting slightly onto the dance floor, halfway down the building, on the northerly side. From the posts the roof sloped over the promenade to the eaves. The lateral walls of the building, except for the front, or westerly end, were of boards to about the height of five feet; and from the rail, at the top of the boarding to the eaves, strong wire screening of about two inch mesh was fastened securely about all except the front end of the building.

Through boarded wall or wire screening there was no door or provision for exit.

The westerly and front end of the building contained an entryway in one corner, a ticket room, check room and refreshments booth, all without the 105 foot floor of the dance hall.

The entryway was 9 feet 8 inches wide, communicating with the southerly promenade by double doors, of ordinary size and opening outward. A patron would enter the building, passing by a ticket window in the north wall of the entryway and through the more northerly of the double doors, to the south and west promenades.

This northerly door was commonly fastened open; the other door being held closed by a spring catch at its top. Thus the commonly used way of exit and entrance faced the southerly promenade.

Facing the northerly promenade was the refreshments booth, having next the promenade, a counter 9 feet long, 18 inches wide, and set 3 feet 2½ inches above the floor, the space above it being clear of obstruction. At the north end of the counter, within the booth, was a door 30 inches wide, opening outward and northerly.

The refreshments booth was 9 feet 10 inches deep, and, directly opposite the counter described, in the outer wall, had a second counter for use in serving customers outside the building. Above this outer counter the space was clear and unobstructed, to the eaves, about 7 feet from the floor.

Ceiling beams crossed the dancing floor from promenade to promenade nearly 13 feet above the floor.

In 1928 the defendant constructed a ceiling over the dance floor and promenade, made of inflammable crepe paper in decorative colors and designs. The crepe paper, with festoons and streamers of the same material, hung from the ceiling beams and from cords stretched from beam to beam as a thick, canopy top, dependent from the beams and cords and carried from the lines of posts at the inner sides of the promenades, along the rafters to the eaves at their outer sides.

Thus dancers and spectators, while within the building, were beneath a closely aggregated ceiling of gauzy paper, hanging free from its supports.

Each post, separating promenades from the dance floor, was stayed at its top with a pair of braces in the plane of the row of posts in which it stood. The braces were of timber about $3\frac{1}{2}$ feet long and joined the posts more than 3 feet below their tops. On one or more of the faces of the posts, 4 feet 2 inches above the floor, 18 inch mirrors were fixed; and streamers or festoons of inflammable crepe paper, similar to that used to make the ceiling, were run down the inner faces of the braces and posts and gathered into knots or decorative bodies above the mirrors. These runners of paper were tacked to the posts.

Around some of the mirrors, if not all, the crepe paper decoration known as festoons was run as a border.

Below the mirrors the posts were bare. The decoration known as festoons was made of ribbons of tissue paper 2 inches in width, glued together along their center lines on a cotton thread, the size of the finer sewing thread, and cut from margins to thread into bars not a sixteenth of an inch wide.

This canopy ceiling and the decorations of the posts had been maintained through the seasons of 1928 and 1929, and on the night of the fire the paper was all as originally hung, except that from some of the posts portions of the paper may have been worn or torn away. The hall was lighted by proper electrical appliances.

Settees and other seats were in use upon the promenades during the intervals between dances or as spectators sat while others danced.

Plaintiff escorted a young lady to the dance hall on the night of

the fire; and at some time after ten o'clock in the evening, when between three hundred and four hundred people were in the hall, during an interval between dances, while his companion was seated at the inner margin of the promenade, about midway of the rear of the building, and plaintiff was standing near her, someone cried, "Fire!" and plaintiff saw flame running up the post at the inner margin of the promenade in the front of the building, nearly opposite where he stood.

This post stood about twenty-five feet from a point opposite the joining of the double doors.

So far there appears no material discrepancy in the testimony.

It is not disputed that the fire was started in the decoration paper on this post, nor that it was communicated almost instantly to the paper ceiling, nor that at once the glowing and burning paper fell toward the floor as the flames swept to every portion of the canopy ceiling.

And it is not disputed that plaintiff, while in the exercise of due care, suffered exceedingly painful and for a time completely disabling burns which required professional care and treatment.

It is not disputed that the fire was communicated to the paper decorations on the post by one of a group of men near the post, none of whom were employees of defendant.

The plaintiff does not know how it was communicated. The defendant contends that the decorative paper was deliberately and purposely fired, from a flaming lighter, a match, or a glowing cigarette, by one of the group of men, who touched off the paper, pinched out that flame and again ignited the paper.

After the second or possibly the third lighting, the miscreant failed to extinguish the flame, and the alarm was given. The creature, who defendant alleges set the fire, was never identified.

At the alarm of fire plaintiff, with his companion, rushed toward the double doors but were stopped, on the dance floor, by the throng of people ahead of them, in like manner seeking exit. Noting a hole in the wire screening near him at this time, which plaintiff says someone had rammed through it, he assisted his companion through the hole and followed her into the outer air.

He had been subjected to a shower of flaming and glowing material from the ceiling for only a few moments, but the damage complained of was done.

He complains of the material used in decorating the hall, and of the number of available exits, the one doorway, 4 feet 6 inches in width provided for general entrance and exit.

The proprietor of a place of amusement, in maintaining such, is bound to exercise only the degree of care that would be expected of an ordinarily careful and prudent person in his position.

"When one expressly, or by implication, invites others to come upon his premises for business or any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger; and, to that end, he must exercise ordinary care and prudence to render the place reasonably safe for the visit."

*Thornton* v. *Agricultural Society*, 97 Me., 114, 53 Atl., 979; *Easler* v. *Amusement Company*, 125 Me., 334, 133 Atl., 905.

If the visitor is present for the benefit of the host, the latter should be held liable for the want of any ordinary care in respect to the condition of the property. *Selinas* v. *Vermont Agri. Soc'y*, 60 Vt., 249, 15 Atl., 117; *Dunn* v. *Brown Co. Agri. Soc'y*, 46 Ohio St., 93, 18 N. E., 96.

The proprietor of a place of public amusement is not an insurer against accident occurring because of the condition of the building, but, so far as the exercise of ordinary care will assure it, he is bound to provide and maintain a structure that will not, because of any insecurity or insufficiency for the purpose for which it is used by him, injure any person rightfully within it. *Ryder* v. *Kinsey*, 62 Minn., 85, 64 N. W., 94, 34 L. R. A., 557; *Dettmering* v. *English*, 64 N. J. L., 16, 44 Atl., 855, 48 L. R. A., 106; *Williams* v. *Mineral City Park Ass'n*, 128 Iowa, 32, 102 N. W., 783, 1 L. R. A. (N. S.), 427; *Schofield* v. *Wood*, 170 Mass., 415, 49 N. E., 636.

It can not be said that decorations of inflammable crepe paper above a dance floor is evidence of negligence *per se*.

The building was not artificially heated. It was wired for and lighted by electricity, and it is admitted of record that at the beginning of the season of 1929 the electric wiring was fully inspected and pronounced in proper condition by a wiring inspector.

Nor is it evidence of negligence that the paper decoration of the ceiling extended down on the faces of certain posts to the top of the mirrors, and around their margins. There is testimony that smoking was forbidden within the building, and placards to that effect maintained.

The condition of ceiling and post decorations was not latent or hidden. It was evident to a patron on a first visit, and plaintiff had visited the hall and noticed the decorations during the summer of 1928, when the materials and their arrangement were as on the night of the fire, ordinary wear excepted.

There is testimony that one manufacturer of decorative crepe paper had on the market, in 1929, a paper so treated as to be comparatively noncombustible.

But the paper here used was that commonly on sale for such uses as here made, and there is no evidence that defendant knew of the existence of noncombustible decorative material useful to his purpose.

That the provision for egress was limited to the westerly end of the building is complained of as negligence in construction and operation.

It is true there was a partial barrier to the door in the northwest corner. But the assembly on the crowded dance floor failed to avail itself of this exit, and surged against the opening afforded by the pair of folding doors in the southwest corner.

Neither in this state, nor any other, so far as we are informed, is there statute regulation of means of exit to be provided in places of amusement, below a second floor.

Whence it follows that recovery, if any, in the case at bar, is determined under the rules of the common law.

"At common law there was no duty imposed upon the owner of a building to provide fire escapes, nor consequent liability for failure to provide them, where the building was properly constructed for its intended use and purpose, the ordinary means of escape by halls, stairs, doors and windows being deemed sufficient." 4 R. C. L., 404.

"At common law there was no liability imposed upon the owner of a building to provide the same with fire escapes or other means

of exit in case of fire." *Arms* v. *Ayer*, 192 Ill., 601, 58 L. R. A., 277.

"We are satisfied that if any duty devolved upon the defendant to anticipate the possible burning of its building, and provide modes of escape adequate to that emergency, such duty did not exist at common law." *Pauley* v. *Steam Gauge & Lantern Co.*, 131 N. Y., 90, 15 L. R. A., 194.

Prior to any enactment of statute requiring fire escapes or other exits, a workman in a factory was injured in escaping after the occurrence of a fire.

"If the fire was not a casualty peculiarly incident to the business and reasonably to be anticipated, then no obligation rested upon the defendant to guard against it in any way." *Jones* v. *Granite Mills*, 126 Mass., 84; *Ryder* v. *Kinsey*, supra.

But this case presents the further condition that direct and positive evidence, entirely uncontradicted, is advanced that the fire was deliberately set by a person over whose sudden action the proprietor and his agents had no control.

In *Jones* v. *Granite Mills*, supra, the Court says:

"The other question is of somewhat different character, for it cannot be said that a failure to construct proper and additional means of exit from a mill in case of fire in any way contributed to the occurrence of the fire itself. All that can be said is, that, if they had been provided, some of the results that followed from the fire might have been lessened, alleviated, or prevented. And the narrow question is presented, whether a master is required by the common law so to construct the mill, or so to arrange the place where his servants work, that they shall be protected from the consequences of a casualty for which he is not responsible. We know of no principal of law by which a person is liable in an action of tort for mere nonfeasance by reason of his neglect to provide means to obviate or ameliorate the consequences of the act of God, or mere accident, or the negligence or misconduct of one for whose acts towards the party suffering he is not responsible. If such liability could exist, it would be difficult, if not impossible, to fix any limit to it. And we are therefore of opinion that it is no part of the duty of a master to his servant, employed in a building properly con-

structed for the ordinary business carried on within it, in the absence of a statute requirement, to provide means of escape from it, or to have remedial agencies at hand to alleviate the results, or to insure the safety of a servant from the consequences of a casualty, to which his negligence does not directly contribute. The common law gives a remedy to a servant who is injured by the wrongful or negligent act of the master; the liability arising upon the doing of the act. But the common law goes no further; it does not provide a remedy when the master is not responsible for the act, on the ground that he has omitted to provide means to avoid its consequences. The master is not liable to the servant unless he has been negligent in something which he has contracted or undertaken with his servants to do, and he has not undertaken to protect him from the results of casualties not caused by him or beyond his control. See *Wilson* v. *Merry*, L. R., 1 H. L. Sc., 326.

"It is no part of the contract of employment between master and servant so to construct the building or place where the servants work, that all can escape in case of fire with safety, notwithstanding the panic and confusion attending such a catastrophe."

The case was decided upon the common law, and the plight of a servant in the Granite Mills horror is comparable in many respects, and his right to recovery as strong as in the case at bar.

Further, it should be said, upon the record we are unable to state that had there been another set of double doors the plaintiff would have escaped from the dance floor without injury.

However grievous plaintiff's hurts, under existing statutes he has no remedy.

*Judgment for the defendant.*