[No. 8746.   Department One.   October 12, 1910.]

WILLIAM W. GREENE, *Appellant*, v. SEATTLE ATHLETIC CLUB, *Respondent*.[1]

LANDLORD AND TENANT—DANGEROUS PREMISES—LIABILITY OF TENANT—THEATERS AND SHOWS—INJURY TO SPECTATOR—CARE.  A lessee, for one night only, for the purpose of giving a public entertainment, of a new state armory, constructed under laws providing for rigid supervision by state officials and experts employed by them, owes no duty to spectators to make an expert inspection of a balcony rail which was apparently safe; only reasonable, and not extraordinary, care being required.

Appeal from a judgment of the superior court for King county, Main, J., entered March 7, 1910, in favor of the defendant, upon granting a nonsuit in an action for personal injuries sustained by a spectator through a defect in the railing of a balcony.  Affirmed.

*E. B. Palmer, Thomas M. Askern,* and *Milo A. Root*, for appellant, contended, among other things, that upon plaintiff's purchase of a ticket, the defendant impliedly contracted to furnish a reasonably safe place to witness the exhibition. *Francis v. Cockrell,* 5 Q. B. L. R. 501; *Scott v. University of Michigan Athletic Ass'n,* 152 Mich. 684, 116 N. W. 624, 125 Am. St. 423, 17 L. R. A. (N. S.) 234; *Weiner v. Scherer,* 117 N. Y. Supp. 1008; *Schnizer v. Phillips,* 108 App. Div. 17, 95 N. Y. Supp. 478.  Defendant should have anticipated the strain upon the railing.  *Schofield v. Wood,* 170 Mass. 415, 49 N. E. 636; Beale, Innkeepers, Hotels, and Theaters, § 322; Brackett, Theatrical Law, pages 117-120; 29 Cyc. 472-3; 1 Thompson, Negligence, §§ 996, 1154-5, 1160.  Regardless of an implied obligation, defendant would be liable as owner or *occupier* of the premises to which it invited the plaintiff.  *Ward v. Hinkleman,* 37 Wash. 375, 79 Pac. 956; *Baker v. Moeller,* 52 Wash. 605, 101 Pac. 231; *Smith v. Delaware River Amusement Co.,* 76 N. J. L. 461, 69 Atl. 970; Shear-

[1]Reported in 111 Pac. 157.

man & Redfield, Negligence (5th ed.), page 713; *Hart v. Washington Park Club*, 157 Ill. 9, 41 N. E. 620, 48 Am. St. 298, 29 L. R. A. 492; *Sebeck v. Plattdeutsche Volkfest Verein*, 64 N. J. L. 624, 46 Atl. 631, 50 L. R. A. 199; 24 Cyc. 1125; 29 Cyc. 453, 472-3-6; 1202 B-1204E; 1 Thompson Negligence, §§ 996, 1154-5, 1160. It was defendant's duty to make all reasonable inspections which could have revealed the defects. *Lusk v. Peck*, 116 N. Y. Supp. 1051; *Smith v. Delaware River Amusement Co.*, *supra*; 29 Cyc. 472-3; 1 Thompson, Negligence, §§ 996, 1154-5, 1160. Whether it exercised due care and performed its duty were questions of fact for the jury. *Schofield v. Wood*, *supra*; *Oxford v. Leathe*, 165 Mass. 254, 43 N. E. 92; *Scott v. University of Michigan Athletic Ass'n*, *supra*; *Barrett v. Lake Ontario Beach Imp. Co.*, 174 N. Y. 310, 66 N. E. 968, 61 L. R. A. 829; *Higgins v. Franklin County Agricultural Society*, 100 Me. 565, 62 Atl. 708, 3 L. R. A. (N. S.) 1132; *Currier v. Boston Music Hall Ass'n*, 135 Mass. 414. Plaintiff made out a *prima facie* case of negligence and thereby shifted the burden of proof to the defendant. *LaBee v. Sultan Logging Co.*, 47 Wash. 57, 91 Pac. 560, 20 L. R. A. (N. S.) 405; *Anderson v. McCarthy Dry Goods Co.*, 49 Wash. 398, 95 Pac. 325, 126 Am. St. 870, 16 L. R. A. (N. S.) 931; *Schnizer v. Phillips*, *supra*; *Fox v. Buffalo Park*, 21 App. Div. 321, 47 N. Y. Supp. 788. See, also, 24 Cyc. 1125; 29 Id. 453, 476; Thompson, Negligence, §§ 996, 1155, 1160; *Lowell v. Spaulding*, 4 Cush. 277, 50 Am. Dec. 776; *Glass v. Colman*, 14 Wash. 635, 45 Pac. 310; *Ward v. Hinkleman*, *Smith v. Delaware River Amusement Co.*, *Scott v. University of Michigan Athletic Ass'n*, *Weiner v. Scherer*, and *Lusk v. Peck*, *supra*.

*O. B. Thorgrimson*, *D. C. Conover*, and *Harold Preston*, for respondent.

Gose, J.—The respondent, a Washington corporation, was organized, among other things, "to give for profit and charge admission to athletic exhibitions, football games and

baseball games, regattas, and running and sailing races."
On the 6th day of May, 1909, it leased the armory in Seattle
from the state for one evening only, and gave an exhibition,
charging an admission fee.    The entertainment consisted
chiefly of foot races.    The portion of the armory used con-
sisted of the drill room, about one hundred feet by two
hundred feet in dimensions, with a balcony about fourteen
feet in width extending around the interior walls at a height
of about twelve feet from the floor.    Three rows of seats, ar-
ranged in amphitheater fashion, extended around the build-
ing.    Around the entire front of the balcony, about twenty
inches from the first tier of seats, there was a railing about
three feet in height, constructed of iron pipe about two inches
in diameter, fastened to vertical bars nine feet apart, made of
like material but somewhat larger, each of which was at-
tached to the floor of the balcony by an iron plate contain-
ing four screws, each two inches in length.    There were no
lateral braces, and the screws did not extend into the heavier
material upon which the floor of the building rested.    One of
the features of the evening was a Marathon race.    The final
lap was closely contested, and the interest in the result
became so great in the finish of the last lap that the spectators
on the east side of the balcony where the appellant was sitting
arose, pushed forward in great numbers, and leaned upon the
railing so that they might get a better view—the contestants
then being under the balcony—causing the railing to break
its connections and precipitate the appellant and others to
the floor below, and injuring the appellant.    There were
several races preceding the accident.    The appellant testified
that the spectators leaned upon the rail "every time the con-
testants came underneath the gallery—several times" prior to
the accident, and that the railing seemed "perfectly safe," and
that it appeared to be solid and substantial.    The expert
testimony discloses that a careful inspection by a competent
builder or architect would have disclosed the defective con-

nection between the rail posts and the floor, but that it would not have been noticed by such experts from a casual examination. The following interrogatory propounded to the respondent, with the answer thereto, is the only evidence touching the question of an inspection:

"Q. Did the Seattle Athletic Club or its agents make any inspection of the Seattle Armory prior to May 6, 1909? A. It is impossible to answer interrogatory 4 by yes or no. The superintendent and physical director of the Seattle Athletic Club were in the armory building on the afternoon of the day on which the exhibition was given, and observed in a general way the arrangement of the room in which the exhibition was given. It would not, however, be correct to say that they made an inspection of it in the way of examining the details of its construction. They observed the railing around the gallery and observed that it was very solid and substantial in appearance."

The only negligence claimed is that the posts or stanchions to which the railing was attached were not securely fastened. It is not claimed that the balcony was overcrowded. At the close of the appellant's evidence, a judgment of nonsuit was entered, from which the appeal is prosecuted.

The appellant contends that, when he purchased a ticket and entered the building, an implied contract arose between the parties which made it obligatory upon the respondent to furnish him a reasonably safe place in which to witness the exhibition. This is undoubtedly the general rule applicable to the owner of such a building, or a lessee for a considerable period of time. It is, however, limited in its application by another rule equally well settled, that reasonable care only is exacted by the law. This is a relative question, depending upon the character of the business in which the party sought to be charged is engaged. *Phillips v. Wisconsin State Agricultural Society*, 60 Wis. 401, 19 N. W. 377; *Williams v. Mineral City Park Ass'n*, 128 Iowa 32, 102 N. W. 783, 111 Am. St. 184, 1 L. R. A. (N. S.) 427; *Odell v. Solomon*, 99 N. Y. 635; *Thornton v. Maine State Agricultural Society*,

97 Me. 108, 53 Atl. 979, 94 Am. St. 488; *Currier v. Boston Music Hall Ass'n*, 135 Mass. 414; *Barrett v. Lake Ontario Beach Imp. Co.*, 174 N. Y. 310, 66 N. E. 968, 61 L. R. A. 829; 29 Cyc. 453; 1 Thompson, Negligence, §§ 994-5; Beale, Innkeepers and Hotels, § 324; *Graves v. Baltimore & N. Y. R. Co.* (N. J.), 69 Atl. 971; *Schofield v. Wood*, 170 Mass. 415, 49 N. E. 636.

The standard of due care is measured in all cases by the conduct of the average prudent man. The pivotal question in the case is, did such standard require the respondent to have the building inspected by an architect or structural engineer or other competent person? The answer to this question requires a brief reference to the history of the construction of the armory. The armory was erected by the state under the provisions of the Laws of 1907, page 83 *et seq.*, the sum of $130,000 being appropriated from the military fund for its construction. It required the governor to appoint a board or commission of six members, comprised of the adjutant general of the national guard of Washington, the ranking officer of the active list of the national guard stationed at Seattle, the state board of control, and the chairman of the board of county commissioners of King county, all of whom were *ex-officio* members of the board. The members of the board were required to act as such until the completion of the armory and acceptance thereof by the state, and to give a bond to the state to be approved by the governor, in the sum of $5,000, conditioned for the faithful performance of the duties imposed upon them by the act. Section 6 of the act required the board "to select the most desirable site, plan and design, and to obtain proper architectural designs, plans and specifications and details, in conformity with such plan and design; to secure the erection and completion of such armory building, conforming faithfully to such plan and design." Section 7 of the act provides that, "All material contracted for shall be of the best quality and to the satisfaction of the board, and the directions, plans and specifi-

cations of the work executed and carried out by skilled and reputable architects, artists, mechanics and laborers, likewise to the satisfaction of the board."

Section 8 provides that,

"The architect chosen by each of these boards shall receive such compensation for his plan and design as the board shall deem reasonable. He shall be supervising architect of said building, and for all contracts for construction or material therefor. He shall see that all material furnished and work done shall be of the best quality, and all contracts with said board are faithfully performed by the parties so contracting with said board. He shall perform all other duties devolving upon him as such architect, and the supervising architect of said building, and may be removed at the pleasure of said board."

and that he should furnish a surety company bond to the state in the sum of $10,000, conditioned for the faithful performance of his duties, by said architect, his assistants and his subordinates.

Section 10 makes the attorney general the legal adviser of the board. Section 11 provides that the commander-in-chief (the governor) shall make such rules and regulations as he may deem expedient to govern the armory. Section 97, Laws of 1909, page 494, provides that the commander-in-chief (the governor) shall promulgate in general orders such regulations for the use of armories as may be proper; that no armory shall be used for other than strictly military purposes without the recommendation of the officer in charge thereof, and that all revenues derived from rentals of the armory shall be turned into the state treasury. The armory was completed in 1909, and rented to the respondent by the adjutant general of the state. The respondent had no right to make any changes in the building.

If fair and reasonable minds might differ as to whether the respondent was negligent, the court was in error in withdrawing the case from the jury. Viewing the case from the standpoint of the conduct of the average prudent man, we

20—60 WASH.

cannot escape the conclusion that there was no duty of further inspection upon the respondent. The defect was not patent. It took the building for one night only, and it had a right to rely upon its apparent safety. The building was new and, as we have seen, had been constructed by the state under a law which provides for the most careful and rigid supervision by the highest officers of the state and the superintendent and architect selected by them. An inspection by experts under such circumstances would have been the exercise of extraordinary care, an act which we are persuaded would not have occurred to any reasonable man. A different degree of care might apply to the builder and owner, and no doubt would apply if he were a private individual; but as to whether it applies to the state, we express no opinion.

"Failure to make certain tests is not negligence where it does not appear that such tests were common or prudent, or where the owner had no reason to think an inspection was necessary." 29 Cyc. 472.

See, also, *Hall v. Murdock*, 119 Mich. 389, 78 N. W. 329; *Baddeley v. Shea*, 114 Cal. 1, 45 Pac. 990, 55 Am. St. 56, 33 L. R. A. 747.

In *Baddeley v. Shea*, the plaintiff, who was in the employ of a transfer company, while carrying a trunk from the defendant's house, was injured by the breaking of a step upon a platform which formed a part of a continuous walk from the defendant's house to the street. It appeared that the platform had been properly built, and that the defendant had no knowledge that it was unsound or unsafe. An examination after the accident disclosed a dry rot on the under side of the plank that broke, and of the stringer on which it rested, which was not apparent from the outside, and which was discoverable only by making an opening through or under the vertical side of the steps sufficient to admit a person under the platform, which was about one foot above the

ground.   Applying the law to the facts stated, the court said:

"It should be borne in mind, however, that the ultimate question of law to be decided is whether it was the duty of the defendant, under the circumstances proved, to examine his platform for the purpose of ascertaining whether there were latent defects in it; for, if such was not his duty, his omission to make such examination was not negligence in any degree, and the defendant was entitled to a verdict (*Smith v. Whittier*, 95 Cal. 279) ; and whether or not such was his duty depends entirely upon whether or not he had notice of facts which would induce a man of ordinary prudence to suspect the existence of a latent defect in consequence of which danger of injury to person or property might be reasonably apprehended; and when, in such a case, the facts, of which one charged with negligence had notice, are known and undisputed, the question of duty to examine for latent defects is a pure question of law, though it may involve a question as to the degree of care required, which is also a question of law when the facts are given.   (*Stratton v. Central etc. Horse R. Co.*, 95 Ill. 25; Sackett on Instructions to Juries, 15.)   In accordance with these principles, courts grant nonsuits and direct verdicts in actions for negligence, whether the negligence in question be that of the defendant or contributory negligence of the plaintiff."

In *Ryder v. Kinsey*, 62 Minn. 85, 64 N. W. 94, 54 Am. St. 623, 34 L. R. A. 557, the plaintiff's minor son was injured by the fall of a brick veneered wall.   The evidence showed that the brick wall was not anchored to the studding or sheeting or to the frame of the building in the customary way, or attached to them in any way, or otherwise supported.   There was no evidence that the defect could have been discovered by the exercise of ordinary care on the part of the owner.   The defendant had purchased the building after its completion.   The court said that the defendant did not build the wall; that its external appearance did not disclose its defective condition; that the defect could not have been discovered by the exercise of ordinary care in the inspection of the build--

ing; and that the jury were correctly instructed to return a verdict for the defense.

"Where the landlord has provided apparatus which is obviously defective, the tenant must either abstain from using it, or must use it with a degree of caution which would be wholly unnecessary if proper works had been put up. But where the defect is not obvious, and is not in fact known to the tenant (which is in such a case to be presumed) he is not bound to use more care than the external appearance of the works seems to demand." 2 Shearman & Redfield, Negligence (5th ed.), § 724.

"The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable nor waste his anxiety on events that are barely possible. He will order his precautions by the measure of what appears likely in the known course of things." Pollock, Torts, 36.

In *Eckman v. Atlantic Lodge*, 68 N. J. L. 10, 52 Atl. 293, the court, in speaking of the duty of a temporary lessee to inspect the building, said:

"Whether such a duty rests upon the temporary lessee of a building constructed and used for public purposes may be doubted, and the determination of this case does not require a decision of that question."

The lessee of the building was exonerated from liability, on the ground that the defect which caused the injury was a latent one. In *Fox v. Buffalo Park*, 21 App. Div. 321, 47 N. Y. Supp. 788, a grand stand owned and constructed by the defendant fell, and the plaintiff was injured. Speaking to the liability of the defendant, the court said that such structures were constructed for the accommodation of a great number of people who at times would be moved to excitement, activity and demonstration, thereby subjecting the structure to great weight and strain; that such conditions must be regarded as within the contemplation of the builders of such structures when they were erected. The defendant had leased the grand stand to a cycling club for the day on which the accident occurred, and the club was giving cycling

races.   Answering defendant's contention that the cycling
club alone was liable, the court said:

"If the plaintiff had brought an action against the cycling
company, it would have been incumbent upon her to have
shown that, as the lessee of the defendant, it had notice of
the defective condition of the stand, or should with reasonable
care have known of its condition."

The last two cases are the only ones called to our attention
which discuss the duty or obligation of a temporary lessee.

The drill room was constructed by the state for public
exhibitions.   The seating capacity of the gallery was not
wholly taken.   The gallery was not overcrowded.   The rail-
ing gave way on account of a latent structural defect, and
not because too many people had been admitted.   The railing
had the appearance of being safe.   The respondent, upon
the facts stated, was warranted in relying upon its appear-
ance.   It had a right to assume that it was structurally
sound.   Upon the whole record, we are constrained to hold
that there is no cause of action against the respondent.

The judgment is affirmed.

RUDKIN, C. J., MOUNT, and CHADWICK, JJ., concur.

MORRIS, J., holding a membership in the respondent, was
disqualified and took no part.