KIM TETERS, APPELLEE, CROSS-APPELLANT, AND CROSS-APPELLEE,
V. SCOTTSBLUFF PUBLIC SCHOOLS, A POLITICAL SUBDIVISION AND
NONPROFIT CORPORATION OF THE STATE OF NEBRASKA,
APPELLEE, CROSS-APPELLANT, AND CROSS-APPELLEE, AND
KIWANIS CLUB OF SCOTTSBLUFF, NEBRASKA, A NONPROFIT
CORPORATION DOING BUSINESS AS CAMP KIWANIS,
APPELLANT AND CROSS-APPELLEE.

567 N.W.2d 314

Filed July 15, 1997.    No. A-96-063.

Julie A. Moran and, on brief, Brian D. Nolan, of Hansen, Engles & Locher, P.C., for appellant.

Paul W. Snyder, of The Van Steenburg Firm, P.C., for appellee Teters.

John R. Hoffert, of Knudsen, Berkheimer, Richardson & Endacott, for appellee Scottsbluff Public Schools.

HANNON, SIEVERS, and MUES, Judges.

HANNON, Judge.

Kim Teters brought this negligence action against Scottsbluff Public Schools (SPS) and Kiwanis Club of Scottsbluff (Kiwanis) for injuries she sustained while serving as a parent volunteer at an SPS sponsored educational and recreational program at Camp Kiwanis in Scottsbluff, Nebraska. A jury found generally for Teters in her action against Kiwanis and awarded her $66,000 for her damages. The district judge, trying the case against SPS under the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 et seq. (Reissue 1991), also found in favor of Teters and held SPS and Kiwanis jointly and severally liable. Both SPS and Kiwanis now appeal. SPS did not join Kiwanis as an appellant, but under Neb. Ct. R. of Prac. 1C (rev. 1996), SPS is considered a cross-appellant. We conclude that under the Nebraska Recreation Liability Act, Neb. Rev. Stat. § 37-1001 et seq. (Reissue 1993), Kiwanis is not liable to Teters, and, therefore, we reverse the judgment of the district court. Concerning Teters' action against SPS, we conclude that SPS had no duty to inspect for latent defects, and, therefore, we also reverse the district court's judgment on this matter.

## I. TETERS' INJURY

On May 9, 1991, SPS sponsored an overnight "outdoor education experience" at Camp Kiwanis, which is operated by Kiwanis, for sixth grade students attending Bluffs Middle School. During the 2-day experience, the students participated in various recreational activities, including canoeing, archery,

and hiking. Teters' daughter attended that event, and in answer to the school's request for parental supervision, Teters also attended. When Teters was injured, she was personally using part of the camp's obstacle course known as the slide-for-life, which is an apparatus that allows the participant to slide down a cable on a pulley. Specifically, Teters was unable to hold onto the pulley upon which she was riding, and as she fell from the pulley, the stitching on the slide's safety harness, which was designed to prevent falls, broke, causing her to fall approximately 15 to 20 feet to the ground. Teters was seriously injured by that fall.

## II. FACTUAL BACKGROUND

In 1949, the city of Scottsbluff leased the land upon which Camp Kiwanis is situated to Kiwanis for 99 years. Over the years, the camp has been managed by the Camp Fire Boys and Girls and Kiwanis. Kiwanis reacquired management of the camp in January or February 1991.

One of the two managers of Camp Kiwanis testified that in April 1991, all groups were required to have reservations in order to use the camp and that no groups were allowed to enter the camp for free. The manager did, however, testify that the Kiwanis' camp board permits the American Heart Association to use the camp without charge. James Livingston, who held the office of secretary of the camp board for Kiwanis, testified that the camp was not open to the public without charge, that the camp was fenced, that there were either "no trespassing" or "private property" signs posted, that the fees Kiwanis received were payment for rental of the facility, and that it was the Boy Scouts' obligation to maintain the slide-for-life. Livingston also testified that the Boy Scouts had built the slide-for-life sometime during Camp Fire's management of the camp.

Camp Kiwanis is located near the Riverside Zoo and is partitioned, at least in part, by a river. It is composed of a lodge, an office building, a craft building, and campgrounds with a bathhouse. According to Camp Kiwanis' fee schedule, the four areas can be rented individually or collectively. Use of the entire facility, excluding the office building, for 2 days and up to 100 persons costs $145.

On February 13, 1991, Livingston sent a letter to the curriculum director of SPS, concerning the use of Camp Kiwanis. The relevant portion of the letter is as follows:

I have enclosed the contract information for the Scottsbluff School 1991 Outdoor Education Program. We are happy that you have found this program a worthwhile addition to your curriculum each year and have chosen Camp Kiwanis as your "outdoor Classroom". We would hope that you would find time to visit the Camp when classes are in session and make any suggestions for improvement to the Camp manager. We are undergoing some changes in management in the Camp, however we are confident that everything will be in place for your anticipated dates (May 2/3, 9/10, 16/17, 23/24).

The total cost for use of Camp Kiwanis for the 1991 program will be as indicated below:

Cleaning deposit $20 per session X 4 sessions
 (refundable if cleanup is done by the school)    $ 80.00
4 sessions of outdoor education at Camp Kiwanis
two days each    $580.00
           TOTAL    $660.00

Please fill in the facility rental contract and return one copy with your 80.00 cleaning deposit (to reserve four weeks) to Camp Kiwanis P.O. Box 294, Scottsbluff, NE 69361. Canoe rental agreements will be sent to you by Campfire.

On February 20, 1991, SPS and Kiwanis entered into a contract entitled "Camp Kiwanis Facility Rental Contract," which reads as follows:

Groups pay the cleaning deposit down when they confirm their reservation. If camp is cancelled four weeks before the event, the cleaning deposit is refundable. If camp is cancelled later than four weeks before the event, the deposit is NOT refundable. Rental fees are due when picking up the keys to open camp. The deposit is returned after the camp has been inspected for damages and for cleanliness and the keys have been turned in.

IT IS HEREBY AGREED THAT

Scottsbluff Public Schools under the supervision of Scottsbluff Public Schools may use Camp Kiwanis on the following dates May 2-3, 9-10, 16-17, and 23-24, 1991.

Both the above named group and the Board of Directors of Camp Kiwanis will abide by the rules, regulations and obligations set forth in the attached materials.

In the "General Rules" section of the attached materials, the following language is found: *"NEITHER THE CITY OF SCOTTSBLUFF, CAMP KIWANIS BOARD OF TRUSTEES NOR CAMP MANAGEMENT is liable for accidents, injuries or loss."* (Emphasis in original.) Additionally, in the section entitled "Other Information" is the following provision:

> *The obstacle course has some new equipment that should be checked out by a supervisor before allowing any youth to use it. We are reasonably sure that the course is safe, but it is necessary to instruct youth on how to use the more difficult sections; such as the slide for life, meat grinder, and log swing. The use of the course is without liability to Camp Kiwanis.*

(Emphasis in original.) SPS paid Kiwanis the $660 for use of the property for four sessions.

When Teters arrived at Camp Kiwanis on May 9, 1991, the students were already in a meeting in which one of the parent volunteers was demonstrating how to canoe. Teters did not come into contact with anyone representing Camp Kiwanis or SPS. After being briefed on canoeing, the students were broken up into 5 groups of approximately 11 or 12 and directed to the parent volunteer of the individual groups. Teters' daughter was assigned to Teters' group. During the course of the day, each group was to participate in five different activities: canoeing, archery, obstacle course, scavenger hunt, and fishing. A parent volunteer was permanently stationed at the canoeing and archery sites but not at the obstacle course.

In the afternoon, Teters' group took its turn on the obstacle course. Part of the obstacle course included the slide-for-life, a recreational instrumentality composed of two elements. The first element was a 15- to 20-foot-high cable connecting two platforms that participants would walk across. Two additional cables suspended above and to the sides of the cable enabled the participants to balance themselves as they crossed between platforms. In order to prevent the participants from falling if they lost their balance, a fourth cable, the safety cable, was sus-

pended above the other cables. Each participant was secured to the safety cable by what was referred to as a "safety harness." The safety harness, which appears to have been a homemade device, consisted of two automobile seatbelts sewn together. (Exhibit 49 is a photograph of a similar harness revealing that one of the belts contained a buckle with the letters "GM" on it.) One belt, which was placed around the participant's waist, was sewn to a second belt, which had a hook that snapped onto the overhead safety cable. If a participant fell while crossing between platforms, the safety harness would prevent the participant from falling to the ground.

The second element of the slide-for-life consisted of a descending cable that ran from the second platform to a pole located some distance away. A pulley device with handles on both sides was attached to the cable. The participants would stand on the second platform, grab hold of the pulley's handles, and step or jump off of the platform. The pulley and the rider would naturally descend down the inclined cable to the ground. A rope, most likely used to pull the pulley back up to the second platform after someone had ridden it to the pole, hung down from the pulley. A safety cable, which also ran between the second platform and the pole, was situated above and parallel to the descending cable. A participant reaching the second platform from the first platform would need to unhook the safety harness from the first safety cable and then rehook it to the descending safety cable. The hook at the end of the safety harness appeared to allow for quick changes.

When Teters' group reached the slide-for-life, two of the students familiar with the obstacle demonstrated its use for the others. Teters, who had not been instructed on its use, learned how to operate it from watching as well. All of the students in Teters' group, except for her daughter and a friend, successfully completed the slide-for-life, and some students went on the obstacle more than once. Before each student used the obstacle, Teters visually checked the harness. However, none of the students dropped far enough to test the harness' ability to withstand weight.

The two reluctant students told Teters that they would only go on the slide-for-life if she did so first. Teters initially said no,

stating, "At that point in time I did not know for sure if I wanted to go on it, whether it would be — whether I was too heavy or that I just didn't know if I wanted to go on it." Teters thought she might be too heavy, weighing 150 pounds, or that she should not go down it because she was an adult. One of the students in her group told her that a teacher, whom Teters knew weighed more than she, had gone down. Teters again inspected the harness before she actually used it and found that it looked the same as when her group first started using it. Teters admitted that she did not see any tears, threads, or loose material during her inspection.

Teters then climbed to the top of the first platform, hooked the safety harness to the safety cable, and walked across the wire to the next platform. Upon reaching the second platform, Teters detached the safety harness from the first safety cable and reattached it to the descending safety cable. Teters then grabbed the pulley and jumped off the platform. According to Teters, one of her hands slipped off the pulley, and as she was falling, she felt the safety harness ripping and tearing. Teters attempted to grab the rope that hung down from the pulley but was unsuccessful. The record is not clear on when in the process of Teters' trip to the ground that the safety harness began to rip. Teters testified that she was grasping the "bar" when the harness started tearing, but she also testified that "when I was slipping and falling the belt started ripping." Nevertheless, the safety harness' belt parted, and Teters fell 15 to 20 feet to the ground. Teters sustained serious injuries as a result of that fall.

At trial, the broken safety harness was not offered in evidence. The camp manager testified that after the accident, he attempted to have the harness repaired but that nobody would agree to do so and eventually it was thrown away. The record reveals that there were two safety harnesses associated with the slide-for-life. Photographs of the second safety harness, which Teters testified was similar to the one she had used, were introduced into evidence. The camp manager testified that in Teters' accident, the stitching holding the two belts together had come undone. There was evidence in the record that the stitching had failed once before when Camp Fire was managing the camp.

It is undisputed that no warnings or instructions were given to Teters concerning the use of the slide-for-life. Additionally,

Teters testified that she did not feel that it was necessary to ask anyone for information regarding its use because "I knew what — we knew what we were supposed to do." Teters further testified that she inspected the harness before each student used it and never observed any loose threads, rips, tears, or unraveling seams.

Kiwanis' motion for summary judgment on the grounds that the Nebraska Recreation Liability Act (Act) barred Teters' action was denied. At the conclusion of evidence, Kiwanis and SPS each moved for a directed verdict. Teters also moved for a directed verdict on the affirmative defenses of SPS and Kiwanis, namely the applicability of the Act. The court denied the motions by SPS and Kiwanis but sustained Teters' motion as to the applicability of the Act. Specifically, the court found:

> The — I find that the Camp Kiwanis is closed to the public without prior arrangement and a payment of scheduled fees. It is not — it is not a place in the eyes of the law under the Tiece v. City of Omaha case where the Recreational Liability Act would apply. That act seeks to encourage owners of the land to make their land available free to the public for recreational purposes by limiting their liability. I find absolutely no applicability to that provision owned by Kiwanis or the land leased and owned by Kiwanis. I find irreconcilable conflict in the language of the statute relating to rent, but I find the characterization that the Kiwanis chooses to call their fee structure rent not persuasive and that reasonable minds could not differ that this is a fee charged situation. I intend to submit this case to the jury on the legal authorities and the legal theories strictly relating to invitee.

The jury subsequently returned a verdict in favor of Teters and against Kiwanis in the amount of $66,000. The district judge also entered judgment in favor of Teters and against SPS, found that Teters' negligence was 0 percent, and concluded that SPS' and Kiwanis' negligence was joint and several. Both Kiwanis and SPS filed a motion for new trial or, in the alternative, a motion for judgment notwithstanding the verdict. The court overruled their motions.

## III. ASSIGNMENTS OF ERROR

Kiwanis contends that the district court erred in (1) in overruling its motion for summary judgment, (2) overruling its motion for a directed verdict, (3) sustaining Teters' motion for a directed verdict, and (4) overruling its motion for new trial and/or its motion for judgment notwithstanding the verdict. Essentially, Kiwanis' sole argument is that the court erred in failing to apply the Act.

SPS contends that the district court erred in (1) overruling its motion for directed verdict, (2) finding that it was liable for Teters' injury, (3) finding that it was guilty of actionable negligence, (4) failing to find that Teters was contributorily negligent in a degree sufficient to bar her recovery, (5) sustaining Teters' motion for directed verdict on the applicability of the Act, and (6) overruling its motion for new trial and/or its motion for judgment notwithstanding the verdict.

Teters cross-appeals, contending that the Act is unconstitutional. However, this court does not have jurisdiction to determine the constitutionality of a statute. Neb. Const. art. V, § 2; Neb. Rev. Stat. § 24-1106(1) (Reissue 1995). We therefore assume that the Act is constitutional without considering the question.

## IV. STANDARD OF REVIEW

In actions brought pursuant to the Political Subdivisions Tort Claims Act, the findings of the trial court will not be disturbed unless clearly wrong, and when determining the sufficiency of the evidence to sustain the judgment, it must be considered in the light most favorable to the successful party. *McIntosh v. Omaha Public Schools*, 249 Neb. 529, 544 N.W.2d 502 (1996). Every controverted fact must be resolved in favor of such party, and it is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Id.*

A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996).

Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an

independent, correct conclusion irrespective of the determination made by the court below. *Brown v. Wilson*, 252 Neb. 782, 567 N.W.2d 124 (1997).

## V. ANALYSIS

A denial of a motion for summary judgment is not a final order and is therefore not appealable. *Moulton v. Board of Zoning Appeals*, 251 Neb. 95, 555 N.W.2d 39 (1996). However, the motions for directed verdict by SPS and Kiwanis raise the same question—that of liability. When a motion for directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 555 N.W.2d 778 (1996).

### 1. NEBRASKA RECREATION LIABILITY ACT

The threshold issue in Teters' action against both Kiwanis and SPS is whether the Act relieves either or both parties of liability. The Act was enacted in 1965 to "encourage owners of land to make available to the public land and water areas for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon." § 37-1001.

If the Act applies, § 37-1002 provides that "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes." Further, § 37-1003 provides:

> [A]n owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby (1) extend any assurance that the premises are safe for any purpose, (2) confer upon such persons the legal status of an invitee or licensee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by an act or omission of such persons.

Under § 37-1005, an owner of land is liable only:
> (1) for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity, or (2) for injury suffered in any case where the owner of land charges the person or persons who enter or go on the land. Rental paid by a group, organization, corporation, the state or federal government shall not be deemed a charge made by the owner of the land.

If the Act applies, it clearly relieves the applicable defendant of liability. In the instant case, Teters does not claim that her fall was in any way caused by willful or malicious conduct by either SPS or Kiwanis, but, rather, contends that the fee paid by SPS to Kiwanis was a charge, which precludes the applicability of the Act.

Unfortunately, the provisions of the Act are so interrelated that it is difficult to organize the discussion of the several issues presented by the facts of this case by following the organization utilized by the Act. To summarize, the applicability of the Act to Kiwanis and SPS depends upon the resolution of the following issues: (1) Were Kiwanis and SPS "owners" under the Act? (2) Was Camp Kiwanis being used for "recreational purposes"? (3) Was the money paid by SPS to Kiwanis a "charge" or a "rental"? and (4) Was Camp Kiwanis open to members of the public without charge under the holding of *McIntosh v. Omaha Public Schools*, 249 Neb. 529, 544 N.W.2d 502 (1996)? In order for the Act to apply so as to restrict common-law liability, the answers to the first, second, and fourth questions must be "yes" and the answer to the third question must be "rental."

### (a) Were Kiwanis and SPS Owners?

Section 37-1008(2) provides that "the term owner includes tenant, lessee, occupant, or person in control of the premises." Kiwanis, as lessee of Camp Kiwanis under a 99-year lease with the city of Scottsbluff, is clearly an owner under that definition. Whether SPS is a tenant, lessee, occupant, or person in control of the camp is less clear.

The contract between SPS and Kiwanis, entitled "Camp Kiwanis Facility Rental Contract," refers to rental fees' being due "when picking up the keys to open camp." It is a very brief

contract, but it states that "Scottsbluff Public Schools under the supervision of Scottsbluff Public Schools may use Camp Kiwanis on the following dates . . . ." Two pages of rules are attached to the short contract. The rules have to do with keeping the camp clean and preserving the improvements and equipment. Thus, while it may be argued that SPS was not a lessee, it is clear from the rental contract that SPS was, at the very least, the occupant or person in control of the camp. Moreover, Nebraska case law establishes that a political subdivision can be an owner under the Act. See *Watson v. City of Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981). We conclude that both Kiwanis and SPS were owners under the Act.

### (b) Was Camp Kiwanis Being Used for Recreational Purposes?

As stated above, in order for an owner to be protected from liability under the Act, the land must be used for recreational purposes. See §§ 37-1002 and 37-1003. Under § 37-1008(3),

the term recreational purposes shall include, but not be limited to, any one or any combination of the following: Hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water-skiing, winter sports, and visiting, viewing, or enjoying historical, archeological, scenic, or scientific sites, *or otherwise using land for purposes of the user.*

(Emphasis supplied.) This definition is so broad, particularly the emphasized portion thereof, that there can be no serious question that SPS and Teters were using Camp Kiwanis for recreational purposes.

### (c) Was Money Paid by SPS to Kiwanis "Charge" or "Rental"?

This question is relevant under two sections of the Act. Section 37-1003 provides that the Act covers "an owner of land who . . . invites or permits without charge any person to use such property for recreational purposes." Section 37-1005 provides that the Act shall not limit liability "where the owner of land charges the person or persons who enter or go on the land. Rental paid by a group, organization, corporation, the state or

federal government shall not be deemed a charge made by the owner of the land." "[T]he term charge shall mean the amount of money asked in return for an invitation to enter or go upon the land." § 37-1008(4). Additionally, § 37-1004 provides that "an owner who leases land to the state for recreational purposes shall not by giving such lease . . . (3) assume responsibility for or incur liability for any injury to person or property caused by an act or omission of a person who enters upon the leased land." With these statutes as background, we now proceed with our analysis of this issue.

The Nebraska Supreme Court has said that the clear meaning of § 37-1005 is that in order to constitute a charge, any moneys paid must be paid for the right to enter the facility. *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309 (1984). In the instant case, it is undisputed that before any group could enter onto Camp Kiwanis, it had to pay a fee. Individuals not part of a paying group were not invited upon the property. The general public, as opposed to the groups who had paid the fee, was not invited upon the land.

SPS paid $145 for each 2-day stay at the camp. According to Kiwanis' fee structure, the SPS' payment was for use of the lodge, craft building, and campgrounds with bathhouse. Teters, however, was not charged any kind of fee to enter onto the property. The issue now before us is whether the fee paid by SPS constitutes a charge which consequently excludes Kiwanis from the protection of the Act.

Section 37-1005 seems to assume a clear distinction between "rental paid" and "charge." Although the district court found that the two terms were irreconcilable, it still concluded that the fee paid was a charge and that therefore Kiwanis was not protected by the Act. We understand the district court's difficulty in trying to distinguish between the two terms. While the Nebraska Supreme Court has differentiated between fees paid for entry upon land and fees paid for the right to use specific facilities associated with that land, see *Garreans, supra* (where court distinguished between entry fee and camper-pad fee), it has never specifically distinguished between "rental paid" and "charges."

A statute is open for construction only when the language used requires interpretation or may reasonably be con-

sidered ambiguous. *State v. Atkins*, 250 Neb. 315, 549 N.W.2d 159 (1996); *Kuebler v. Abramson*, 4 Neb. App. 420, 544 N.W.2d 513 (1996). Because the term "rental paid" is not specifically defined in the Act, we must interpret this phrase, especially as it relates to the term "charge." Interpretation of a statute requires the court to determine and give effect to the intent of the Legislature and the purpose intended to be advanced by adoption of the statute, as can be ascertained from the entire language of the statute, given the plain, ordinary, and popular sense of the statute's language. *Kuebler, supra.*

The legislative history of the Act throws some light on the intended distinction between the terms "charge" and "rent." The Act is based substantially on a model recreational land use act promulgated by the Council of State Governments (hereinafter model act). See 24 Council of State Governments, Suggested State Legislation 150 (1965). See, also, Annot., Effect of Statute Limiting Landowner's Liability for Personal Injury to Recreational User, 47 A.L.R.4th 262 (1986); 62 Am. Jur. 2d *Premises Liability* §§ 118 to 135 (1990). The model act uses the term "charge" but not the term "rent." It provides that land leased to the state or a subdivision thereof for "any consideration" shall not be deemed a charge. 24 Council of State Governments, *supra* at 151. In comparison, Nebraska's Act provides, in place of that provision, that "[r]ental paid by a group, organization, corporation, the state or federal government shall not be deemed a charge made by the owner of the land." § 37-1005. Thus, Nebraska's Act enlarges the exception in terms of the organizations that can qualify for protection but limits the exception to those transactions where rent, as opposed to any consideration, is paid.

Nebraska's legislative history sheds some additional light on the issue. The Committee Statement on L.B. 280, 75th Leg. (March 26, 1965), of the Agriculture and Recreation Committee, stated that the proposed bill varied from the model act in that the proposed bill would not provide a limitation on liability for an injury suffered "in any case when a charge is made *unless that charge be in the nature of rent.*" (Emphasis supplied.) The statement explained that the "effect of this act would be to open more lands to recreational activities on either a free or a rental basis."

In Webster's Encyclopedic Unabridged Dictionary of the English Language 248 (1989), only 2 of the 46 definitions of the word "charge" have a meaning possibly applicable to the use intended by the Act: "35. a fee or price charged: *a charge of 59 cents for admission*," and "36. a pecuniary burden, encumbrance, tax, or lien; cost; expense; liability to pay." The same work defines "rent" as "a payment made periodically by a tenant to an owner or landlord in return for the use of land . . . or other property." Webster's, *supra* at 1215.

■ The Nebraska Supreme Court has said, " ' "A lease is a species of contract for the possession and profits of land and tenements, either for life, or for a certain period of time, or during the pleasure of the parties; and the essential elements of a contract must be present," ' quoting 51 C.J.S. *Landlord & Tenant* § 202 b. (1947)." *Krance v. Faeh*, 215 Neb. 242, 245, 338 N.W.2d 55, 57 (1983). Accord *Johnson v. City of Lincoln*, 174 Neb. 837, 120 N.W.2d 297 (1963).

■ "A lease of real estate is a hiring or renting of it for a certain time for a named consideration. A tenant rents the land and pays for it either in money or a part of the crops . . . ." *Hampton v. Struve*, 160 Neb. 305, 311, 70 N.W.2d 74, 78 (1955) (where court was considering whether person who planted crop was tenant or sharecropper). In comparison, someone may be granted a license to enter upon real estate. "A license in respect of realty is an authority to do an act on the land of another without possessing any estate in the land, and is to be distinguished from a grant or demise creating some interest in the property." 53 C.J.S. *Licenses* § 88 (1987). In view of the relative meanings of these words and the use of the word "lease" in § 37-1004, we conclude that the Legislature intended to draw a distinction between consideration paid for a lease, that is, becoming a tenant on the property with the right of possession, and consideration paid for a license or mere permission to go upon the land.

In the instant case, it is clear that Teters would not have been able to enter onto Camp Kiwanis had SPS not paid the money. Nevertheless, Kiwanis' fee schedule and the "rental contract" suggest that the fee was for rental of various areas of the property rather than for admission. SPS received more than the right to go upon Camp Kiwanis. SPS was the exclusive user of the

camp during the time it had reserved the property, and the written contract, which specifically used the term "rent," provided that the camp was under SPS' supervision. Consequently, we conclude that the fee paid by SPS was not a charge but, rather, a rental.

### (d) Was Camp Kiwanis Open to Public?

In *McIntosh v. Omaha Public Schools*, 249 Neb. 529, 544 N.W.2d 502 (1996), the Nebraska Supreme Court held, upon the basis of the purpose of the Act stated in § 37-1001, that the Act did not apply to a student participating in a clinic sponsored by the student's school's athletic program because the property on which the injury occurred, the school's athletic field, did not fall under the category of recreational use of land open to members of the public without charge. In doing so, the court recognized that a landowner need allow only some members of the public, including the plaintiff, to use the owner's land without charge to facilitate the purpose of the Act. See, also, *Holden v. Schwer*, 242 Neb. 389, 495 N.W.2d 269 (1993) (Act applied where defendant selectively allowed members of public, including plaintiff, to use land for recreational purposes).

Recently, in *Brown v. Wilson*, 252 Neb. 782, 567 N.W.2d 124 (1997), the Nebraska Supreme Court concluded that a child who was invited to her friend's home to play was not a member of the "public" under the Act. As stated by the court:

> The term "public" connotes "an unexclusive group of persons." 73 C.J.S. *Public* at 330 (1983). The word "public" has also been defined as "[t]he whole body politic, or the aggregate of the citizens of a state, nation, or municipality[;] . . . does not mean all the people, nor most of the people, . . . but so many of them as contradistinguishes them from a few[;] . . . the people of the neighborhood[;] . . . the inhabitants of a community." Black's Law Dictionary 1227 (6th ed. 1990).

252 Neb. at 786-87, 567 N.W.2d at 128.

In the instant case, Kiwanis allowed any unexclusive group of persons to use the camp that wished to do so, upon the payment of rent. Thus, with respect to Kiwanis, the camp was open to the public.

Although SPS qualifies as an owner under the Act because it was an occupant or a person in control of the premises, it is not entitled to the protection of the Act because it did not hold the land open to members of the public. For the 2 days that SPS was on the premises, Camp Kiwanis was not open to the "public," as that term is defined in *Brown*. Only students, teachers, and parent volunteers could enter onto the land. See, e.g., *McIntosh, supra* (where field was open only to students who were members or who intended to be members of school's football team). Teters, as a parent of one of the attending children, was not a member of the public. If SPS had owned the camp and sponsored the same type of educational and recreational event, it is clear that under *McIntosh*, it would not be entitled to the protection of the Act. A school or any other similar organization should not, therefore, be able to avoid liability for its negligence merely by renting land from an owner who is entitled to the protection of the Act.

In sum, we conclude that Kiwanis is afforded the protection of the Act but that SPS is not. Kiwanis was an "owner" of land, the land was used for "recreational purposes," the money paid was a "rental" rather than a "charge," and the land was held open to members of the public. SPS, however, did not hold that land open to members of the public, and consequently, it is subject to common-law liability.

### 2. TETERS VERSUS SPS

Having concluded that SPS is not entitled to the protection of the Act, we now address whether SPS can be held liable for Teters' injury. We first note that Teters does not qualify as an employee of SPS within the Nebraska Workers' Compensation Act. See, e.g., *Mesa County Valley Sch. D. 51 v. Goletz*, 821 P.2d 785 (Colo. 1991) (volunteer baseball coach was not employee for workers' compensation purposes); *Bd. of Educ. of Alpine School Dist. v. Olsen*, 684 P.2d 49 (Utah 1984) (volunteer carpenter in woodshop class was not employee for workers' compensation purposes).

The Nebraska Supreme Court has said, "It is general knowledge that a public school is a tax-supported political subdivision in the business of providing academic and physical fit-

ness and, as such, is liable for negligence under the Political Subdivisions Tort Claims Act." *McIntosh v. Omaha Public Schools*, 249 Neb. 529, 536, 544 N.W.2d 502, 507 (1996). For actionable negligence to exist, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately resulting from such undischarged duty. *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987). We note that while some jurisdictions impose upon employers different standards of care if the individual is a gratuitous employee or a volunteer, see, 30 C.J.S. *Employers' Liability* § 16 (1992); *Milbank Mut. Ins. Co. v. Dairyland Ins. Co.*, 373 N.W.2d 888 (N.D. 1985) (which has statute defining gratuitous employee), Nebraska makes no such distinction.

Recently, in *Heins v. Webster County*, 250 Neb. 750, 552 N.W.2d 51 (1996), the Nebraska Supreme Court abrogated the classifications of invitee and licensee in favor of a standard of reasonable care for all those lawfully on the premises of another. However, the *Heins* rule is prospective in application and thus without effect in the instant case.

An invitee is a person who goes on the premises of another in answer to the express or implied invitation of the owner or occupant on the business of the owner or occupant or for their mutual advantage. *Heins, supra.* Landowners owe invitees the duty of reasonable care to keep the premises safe for the use of the invitee. *Id.* A business visitor is considered an invitee, and thereby receives a higher degree of care, reasonable care, ostensibly because he or she conveys some benefit upon the landowner. *Id.*

A licensee is a person who is privileged to enter or remain upon the premises of another by virtue of the possessor's express or implied consent, but who is not a business visitor. *McIntosh, supra.* An owner or occupant of premises owes only the duty to refrain from injuring a licensee by willful or wanton negligence or designed injury, or to warn the licensee of a hidden danger or peril known to the owner or occupant but unknown to or unobservable by the licensee, who is required to exercise ordinary care. *Heins, supra.*

The distinction between invitees and licensees rests on the purpose for which the invitation was extended. *Palmtag v.*

*Gartner Constr. Co.*, 245 Neb. 405, 513 N.W.2d 495 (1994). If it is an invitation for personal pleasure, convenience, or benefit of the person enjoying the privilege, the person receiving it is a licensee, but if the invitation relates to the business of the one who gives it or for the mutual advantage of a business nature for both parties, the party receiving the invitation is an invitee. *Id.*

In the instant case, Teters responded to SPS' request for parent volunteers to supervise and provide assistance with the sixth grade's overnight trip to Camp Kiwanis. The invitation was an express invitation of a business nature. Thus, Teters was an invitee.

■■■ A possessor of land is subject to liability for injury caused to a business invitee by a condition of the land if (1) the possessor defendant either created the condition, knew of the condition, or by the exercise of reasonable care would have discovered the condition; (2) the defendant should have realized the condition involved an unreasonable risk of harm to a business invitee; (3) the defendant should have expected that a business invitee such as the plaintiff either (a) would not discover or realize the danger, or (b) would fail to protect himself or herself against the danger; (4) the defendant failed to use reasonable care to protect the plaintiff invitee against the danger; and (5) the condition was a proximate cause of damage to the plaintiff. *McIntosh, supra.* This is essentially the same duty of care owed by an employer to an employee. See *Grote v. Meyers Land & Cattle Co.*, 240 Neb. 959, 485 N.W.2d 748 (1992). Moreover, the Nebraska Supreme Court has stated: "A landowner should not be held liable for defects which an investigation might reveal unless the situation suggests an investigation, and the facts indicate to a reasonably prudent man the likelihood of existence of some hidden danger to persons lawfully on the premises." *Kozloski v. Modern Litho, Inc.*, 182 Neb. 270, 274, 154 N.W.2d 460, 463 (1967).

The instant case presents us with the rare situation where the business invitee of a temporary lessee is attempting to hold the temporary lessee liable for an artificial condition present on the owner/lessor's property. It is undisputed that SPS neither created nor knew of the condition of the slide-for-life's safety harness. Therefore, SPS' liability is dependent on its duty to exer-

cise reasonable care, which can only be found in a duty to discover a patent defect or flaw in the safety harness and in SPS' failure to fulfill that duty.

According to the rental contract, SPS only had use of Camp Kiwanis for four 2-day stays but was not in continuous possession of the camp between those stays. At trial, Teters testified that she visually inspected the safety harness before each student used it as well as before she used it. Such inspections revealed no patent defects. The question now before us is whether SPS, as temporary lessee, had a duty to inspect the slide-for-life for latent defects.

In *Greene v. Seattle Athletic Club*, 60 Wash. 300, 111 P. 157 (1910), the owner of an armory leased the property to a corporation for only one evening to hold an exhibition of foot races. The corporation charged an admission fee. During one of the races, a balcony, where the plaintiff and others were watching the races, collapsed. Prior to the races, the corporation had observed in a general way the arrangement of the room in which the exhibition was given but had not made a detailed inspection of its construction. The plaintiff then brought suit against the corporation for damages. At the close of the plaintiff's evidence, the court entered a judgment of nonsuit.

On appeal, the issue was whether the corporation had a duty to have the building inspected by an architect or structural engineer. In holding that the plaintiff did not have a cause of action, the court stated:

> The drill room was constructed by the state for public exhibitions. The seating capacity of the gallery was not wholly taken. The gallery was not overcrowded. The railing gave way on account of a latent structural defect, and not because too many people had been admitted. The railing had the appearance of being safe. The respondent, upon the facts stated, was warranted in relying upon its appearance. It had a right to assume that it was structurally sound.

*Greene*, 60 Wash. at 309, 111 P. at 160. With respect to the corporation's duty as temporary lessee, the court stated:

> Viewing the case from the standpoint of the conduct of the average prudent man, we cannot escape the conclusion

that there was no duty of further inspection upon the respondent. The defect was not patent. It took the building for one night only, and it had a right to rely upon its apparent safety.

*Id.* at 305-06, 111 P. at 159.

The court in *Oxford v. Leathe*, 165 Mass. 254, 43 N.E. 92 (1896), also addressed the duty of a temporary lessee. There, the owner of a rink leased the rink to the lessee for 4 days to conduct horse-training exhibitions. On the eighth day, the lessee was still holding over pursuant to an oral agreement when a platform collapsed, injuring the plaintiff. The plaintiff then brought an action against the owner rather than the lessee. With respect to the owner's liability, the court stated, "At the same time, the short and interrupted character of the occupation allowed to [the lessee] made it obvious that the safety of the building must be left mainly to the [owner]." *Oxford*, 165 Mass. at 255, 43 N.E. at 93. See, also, Annot., Amusements-Injury to Patron, 22 A.L.R. at 628 (1923).

█ Based on *Greene* and *Oxford*, we conclude that SPS did not have a duty to inspect the slide-for-life for latent defects. SPS was in possession of Camp Kiwanis for only a very short period of time, and the slide-for-life had the appearance of being safe. Moreover, Teters herself repeatedly inspected the safety harness without finding any defects. SPS had a right to rely upon the obstacle's apparent safety and assume that it was structurally sound. It naturally follows that SPS did not have a duty to warn users of latent defects. In the absence of such duties, there is no ground upon which to base liability. We conclude that the evidence would not support a finding that SPS did not create or know of the condition, nor did it fail in any way to exercise reasonable care to discover the condition, at least one of which is a predicate to establish the first of the five elements that a business invitee must prove in order to impose liability on a possessor of land. See, e.g., *McIntosh v. Omaha Public Schools*, 249 Neb. 529, 544 N.W.2d 502 (1996).

## VI. CONCLUSION

We conclude that Kiwanis was immune from liability under the Nebraska Recreation Liability Act and that SPS, as tempo-

rary lessee, did not owe Teters a duty to inspect for, or warn of, latent defects. Because a latent defect in the safety harness was responsible for Teters' injury, SPS cannot be held liable. The judgment of the district court is therefore reversed as to both SPS and Kiwanis.

REVERSED.